370 So.2d 225 (1979)
DAMSON OIL CORPORATION
v.
SOUTHEASTERN OIL COMPANY, Fairchild Construction Company, Ltd. and Marion Corporation.
No. 51073.
Supreme Court of Mississippi.
April 4, 1979.
Leslie H. Southwick, John M. Grower, Brunini, Grantham, Grower & Hewes, Jackson, for appellant.
Heidelberg, Woodliff & Franks, Luther M. Thompson, Jackson, for appellees.
Before PATTERSON, C.J., and BROOM and BOWLING, JJ.
BROOM, Justice, for the Court:
Oil well drilling permits (pooling adjacent 40-acre tracts) proposed by competing petitions before the Mississippi Oil & Gas Board (the Board herein) are at issue. Damson Oil Corporation (Damson herein) appeals the circuit court's reversal of the order of the Oil & Gas Board which order canceled a drilling permit issued to appellee, Southeastern Oil Company (Southeastern herein) to drill on an 80-acre unit consisting of the SW-1/4 of SW-1/4 of Section 22, Township 7 North, Range 17 West, in Wayne County, and the SE-1/4 of SW-1/4 of said section. In addition to canceling Southeastern's permit, the Board awarded Damson a permit to drill on an 80-acre tract consisting of the SW-1/4 of SW-1/4 of said Section 22, and the adjacent NW-1/4 of the NW-1/4 of Section 27. The 80-acre units are herein designated as AB (granted Damson by the Board), and AC as proposed by Southeastern which proposal was ordered by the Circuit Court of Wayne County, reversing the Board's order.

Southeastern began the litigation by filing with the Board its application for a Tract AC drilling permit, which the Board approved. Southeastern's application (Form 2) did not indicate (as called for in the instructions on its reverse side) the fact that a dry hole had previously been drilled on Tract C of the proposed AC unit. Southeastern *226 owned virtually all the working interest in Tract C but owned only three-tenths of one percent (.003) of the working interest in Tract A and none in Tract B. Attached as Appendix A is a map representing the tracts in issue, proposed well sites, and the surrounding area. Southeastern's proposed well site is identified on the appendix map by the small circle in Tract A, and Damson's proposed well site is identified as "Proposed location" on Tract B.
The Mills-Cochran Well (in Tract C as per Appendix A) is a dry hole which was drilled over ten years before Southeastern filed its application (which made no notation of the dry hole). Shown also on Appendix A is the probable productive limits of the field, indicated by the dotted line running in a north-northeasterly direction pointed out by an arrow just to the left of the language "Probable Productive Limits," which dotted line runs through the Mills-Cochran Well site.
Damson, upon learning of the issuance of the drilling permit, filed a petition with the Board not only to revoke Southeastern's AC permit but also to obtain for Damson a drilling permit for the AB tract by force-pooling all the interests of all the owners of the AB tract under the force-pooling statute, Mississippi Code Annotated Section 53-3-7 (1972). Damson, in its petition, argued that Southeastern's AC permit was issued in violation of the pooling statute, as there were separately owned tracts within the 80-acre unit whose owners had not agreed to pool their interests. In response to Damson's petition, the Board conducted a hearing on February 16, 1977, to determine whether Southeastern's permit to drill should be revoked and, if so, which one of the parties should be awarded its force-pooling drilling permit (Unit AC or AB).
Geologist Harold Karges, Southeastern's expert, testified at the hearing before the Board that, in his opinion, the AC unit sought by Southeastern would better protect the co-equal and correlative rights of all the parties. Damson's expert, Geologist Wood, testified in favor of Damson's proposed AB unit.
The Board, in its decision, accepted Damson's argument and canceled the drilling permit previously issued to Southeastern on the ground (among others) that Southeastern's unit would pool acreage proven unproductive in the eastern half of its proposal, and would not protect the equal and correlative rights of all owners of interests in the separately owned tracts. At the same time, the Board, upon Damson's petition, awarded Damson a permit to drill under Tract AB, and force-pooled all interests in the eighty acres of AB, noting that Damson owns or represents approximately ninety-three percent of the drilling rights in the AB unit.
Southeastern appealed to the Circuit Court of Wayne County which reversed. Damson appeals here from the circuit court order contending that the Board properly canceled Southeastern's permit for the AC unit, and that the circuit court erred in reversing the Board's order. Damson asserts that the Board properly canceled Southeastern's permit on the ground that under the permit separately owned tracts would have been pooled without notice and hearing. Accordingly, Damson says the circuit court erred in reversing the Board's order which granted Damson the AB permit. The applicable portion of the pooling statute is as follows:
§ 53-3-7. Integration of interests; pooling agreements and orders.
(a) When two or more separately owned tracts of land are embraced within an established drilling unit, the person owning the drilling rights therein and the rights to share in the production therefrom may validly agree to integrate their interests and to develop their lands as a drilling unit. Where, however, such persons have not agreed to integrate their interests, the board may, for the prevention of waste or to avoid the drilling of unnecessary wells require such persons to integrate their interests and to develop their lands as a drilling unit. All orders requiring such pooling shall be made after notice and hearing, and shall be upon terms and conditions that are just and *227 reasonable, and will afford to the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense. (Emphasis added.)
This portion of the statute has been implemented by the following portion of Oil and Gas Board Rule 4:[1]
(a) Before any person shall commence the drilling of any well in search of oil or gas, such person shall file with the Board on Form 2 his application for a permit to drill accompanied by a certified plat and by a fee of $100.00 payable to the State Oil and Gas Board. When two or more separately owned tracts of land are embraced within the unit for which the permit is sought, the application shall affirmatively show that owners of drilling rights in all such tracts have consented to the drilling of the well. ... If the application complies in all respects with the rules and regulations of the Board relating thereto, a permit shall be issued promptly by the Supervisor... . If the application for permit does not comply in all respects with the rules and regulations of the Board relating thereto, said application shall be disallowed, and the Supervisor shall promptly notify the applicant of the reason or reasons for said disallowance. (Emphasis added.)
In support of its argument, Damson argues that Southeastern could not pool the two forty acre tracts under common law cotenancy principles. Damson concedes that one cotenant may exploit the common minerals without the consent of other cotenants. Anderson v. Butler, 203 Miss. 512, 35 So.2d 709 (1948). Damson further argues that the two forty acre tracts, A and C, had "separate ownership" under the common law dealing with cotenancy. The argument is based on the fact that although Southeastern has an undivided interest over the entire proposed eighty acre AC unit, the cotenants as to Tract A differed from the cotenants in Tract C. Although Southeastern could have drilled on either of the forty acre tracts (A or C) without the consent of the remaining owners of that one tract, says Damson, they could not pool them both and produce jointly from one well without consent of all cotenants.
According to Damson, under the common law principle that a cotenant is entitled to a proportionate share in the minerals which he owns, pooling would affect his proportion of that share. In its brief Damson asserts: "For example, if one individual owns an undivided one-half mineral interest in one forty acre tract that is pooled with an adjacent forty acre tract in which that individual owned no minerals, his interest in any production from the entire drilling unit is one-quarter." Therefore, according to Damson, such an individual cotenant does not have the right to reduce another cotenant's interest from one-half to one-quarter without the required notice and hearing under the statute.
Southeastern asserts, to the contrary, that Damson's analysis is invalid because it is based upon the faulty premise that the common property is not the eighty acre production unit established by the special field rules. In its brief, Southeastern contends:
We are not here considering two separate forty acre tracts, but one eighty acre tract, which is the only size drilling unit allowed. Considering the tract as a whole, which must be done, Southeastern is a cotenant with every other party within the tract as to all lands within the tract. Furthermore, considering the tract as a whole, it is the majority interest owner.
We cannot accept the argument of Southeastern in this regard, that its ownership of an undivided interest throughout the entire tract takes the property out from under the pooling statute. Our view is that there are separately owned tracts within Tract AC as contemplated by § 53-3-7, supra, and Board Rule 4. When Southeastern *228 filed its petition, Tract AC was two separate tracts even though they were contiguous. Southeastern contends that when the Board in this case established eighty acre spacing, the effect was to erase traditional governmental forty acre survey lines insofar as "separately owned tracts" are concerned. Although such an interpretation of "separately owned tracts" may seem to have a measure of technical logic, our conclusion is that on the facts of this case (as to the minerals), there are two "separately owned tracts" within the AC area. Therefore, force-"pooling" them under § 53-3-7 requires "notice and hearing" which was not done when Southeaster applied for its AC permit. It follows that Southeastern, confronted with "separately owned tracts" in the eighty acres comprising its proposed AC unit, is not administratively entitled to a drilling permit without adhering to notice and hearing under Mississippi Code Annotated § 53-3-7(a) (1972). There being: (1) separately owned tracts of land within the proposed AC unit, and (2) failure of the owners of these separate tracts to agree to the formation of the unit, Southeastern should not have been granted the AC permit. We conclude that the Board's cancellation of Southeastern's permit on the basis that separately owned tracts existed within Tract AC was with justification and not arbitrary or capricious.
Next, Damson contends that the Board properly approved its application for a drilling permit after canceling Southeastern's permit. As to this issue, Damson cogently makes three contentions:
1. Southeastern's AC unit "would not protect the co-equal and correlative rights of all owners of interest in the separately owned tracts and would result in the drilling of unnecessary wells."
2. The AB unit proposed by Damson should be approved and, in order to prevent waste and avoid the drilling of unnecessary wells, force integration should be granted.
3. The owners of a larger percentage of the drilling rights in Tract A have consented to Damson's AB unit than have consented to Southeastern's AC unit.
Damson correctly asserts that even the testimony of the Southeastern petroleum geologist indicated Southeastern's AC unit would include within its boundaries substantial acreage not underlain by oil or gas. At best, according to the testimony, twenty-five to thirty acres of the proposed AC unit is not underlain by producible quantities of oil and gas, and this incorporation into a drilling unit of substantial non-productive acreage will dilute the rights of the owners of the productive acreage. Furthermore, if the proposed AC unit were approved, then to pool Damson's B forty with the forty acres directly to the east would also incorporate substantial acreage not underlain by producible minerals, thus diluting the interests of the owners of the B forty.
Southeastern, in reply, asserts that "the only testimony in this record concerning co-equal and correlative rights is that of Mr. Harold Karges." When Karges was asked his opinion as to whether the co-equal and correlative rights of all parties in interest would best be protected by the unit proposed by Damson or the unit for which the permit has already been issued to Southeastern, he replied: "In my opinion, the rights of all parties involved would be best protected by the granting, or the continuation of the permit as issued to the Southeastern Oil Company rather than Damson."
Michael Wood, geologist for Damson, testified that he did not agree with the map presented by Karges. On the contrary, oil had moved through the area but was no longer present, from an analysis of the Mills-Cochran well. Wood testified that: "It would be my judgment that that would be considered a high risk proposition to state there was oil in that vicinity of that bore hole."
Confronted with conflicting expert testimony (as is often the case), the Board found:
[T]hat the unit proposed by Southeastern Oil Company would pool acreage proven unproductive in the SE-1/4 of the SW-1/4 *229 of said Section 22 by a dry hole drilled thereon to a sufficient depth to test the producing horizons of the subject field, and that said proposed unit would not protect the co-equal and correlative rights of all owners in interest in the separately owned tracts included in said unit and would result in the drilling of unnecessary wells.
Damson correctly points out that pooling of productive acreage with unproductive acreage dilutes the rights of the owners of interests in the productive acreage. Southeastern answers that Damson established the special field rules for the field and included the eastern half of the proposed Southeastern unit within the area covered by the special field rules, which is indicative of the fact that Damson must have considered this acreage to contain producible hydrocarbons. Faced with the competing petitions of the parties and the complicated geological aspects of the surrounding area, the Board was called upon to decide the issues raised. We hold that the Board's finding, that the AC unit proposed by Southeastern would not protect the co-equal and correlative rights of the parties in interest and would result in the drilling of unnecessary wells, was made upon substantial evidence. It cannot be said, therefore, that the Board erroneously canceled Southeastern's AC permit or that it erroneously approved Damson's application for its AB drilling permit.
It follows that the circuit court erred in finding that there was insufficient or unsubstantial evidence supportive of the Board's order in favor of Damson.
The applicable standard for judicial review is:
[T]he Court to which the appeal is taken shall only inquire into ... whether or not its decision is supported by substantial evidence or is arbitrary or capricious, or beyond the power of the Board to make, or whether it violates any constitutional right of the complaining party.
California Co. v. State Oil & Gas Board, 200 Miss. 824, 27 So.2d 542 (1946). See also, State Oil & Gas Board v. Mississippi Mineral & Royalty Ass'n, 258 So.2d 767 (Miss. 1972).
Contrary to the applicable standard, the circuit court in effect conducted a trial de novo on issues initially raised before the Oil & Gas Board, and substituted its own opinion in place of that of the Board. Southeastern's argument (that the invalidation of its previously issued permit by the Board on the grounds that part of the unit contains unproductive acreage is inherently arbitrary) is without persuasion upon the record as made. The court stated its basic reason for reversing the Oil & Gas Board as follows:
As in court proceedings, the burden of proof in this controversy is on the party seeking to have the drilling unit changed. (Damson). In the opinion of this court the evidence presented by the record simply does not meet this burden and it does not constitute a good cause to alter the unit and cancel Southeastern's previously approved permit.
Presented by the record was a complicated set of facts, but the circuit court failed to properly apply the substantial evidence test, which here requires "the acceptance of the factual conclusions of the Oil & Gas Board." This is true because the Board's conclusions were at least based upon substantial evidence. It follows that reversal is required, and the order of the Oil and Gas Board is reinstated.
REVERSED, AND THE ORDER OF THE OIL AND GAS BOARD REINSTATED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.

Appendix to follow.

*230 APPENDIX A

NOTES
[1] The Board's rules were not actually put in the record but Rule 4 appears in the briefs on file without dispute.