604 So.2d 312 (1992)
John W. McGOWAN
v.
MISSISSIPPI STATE OIL & GAS BOARD.
No. 07-CA-59604.
Supreme Court of Mississippi.
June 24, 1992.
Rehearing Denied August 12, 1992.
*313 David K. McGowan, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Tim Waycaster, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and McRAE, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's appellant challenges the State Oil and Gas Board's denial of permission that he operate salt water disposal wells without a device known as a packer. En route he presents fundamental questions of law and policy in our regulatory state. We consider these with care for at their core they challenge the efficacy of what we have known for near half a century.
We find in the end the Board has been charged by law to enforce two competing public policies  the prevention of waste and the control of environmental hazards. The Board has not favored us with minimally adequate findings on these points, much less an explanation how it has evaluated and balanced the competing interests and decided which should rule the day.
We vacate and remand.

II.
John W. McGowan ("McGowan") is in the oil business. Like others, he has, over the years, struggled with the problem of salt water disposal. The Mississippi State Oil & Gas Board ("the Board") has taken the position that salt water disposal wells must *314 be equipped with a packer, ostensibly to better protect underground sources of drinking water ("USDW"). McGowan's wells contain no packer, and he has of late sought regulatory approval of his "packerless" engineering design and methodology for disposal by subsurface injection.
As McGowan sees it, producing oil wells over time yield increasingly greater percentages of salt water and increasingly smaller percentages of oil, and this progression becomes geometrically pronounced as the well approaches the end of its economic life. In his view, the increasing cost of disposing of this salt water vis-a-vis the decreasing oil revenues eventually causes wells to be abandoned. McGowan's "packerless" salt water disposal design allows him to dispose of huge volumes of salt water more economically. Using this design, McGowan says he has purchased and now operates 130 producing wells in four states  wells which, in his view, would otherwise have had to be abandoned. He sees the benefits of his design as substantial production we would otherwise do without, considerable revenue for thousands of working interest and royalty owners, as well as the state through severance taxes. He argues the continued lives of these wells provide a source of employment for hundreds of people. More globally, McGowan trumpets a technology offering hope for a declining industry.
In 1984, McGowan obtained from the Board provisional permits to operate several of his salt water disposal wells without a packer.[1] In December of 1986, he applied for a new permit for two such wells in the Heidelberg Field in Jasper County, again with packerless exceptions, citing his record under the 1984 permits. He presented his case at the Board's regular January, 1987, meeting. Before acting on the application, the Board, on January 26, 1987, ordered McGowan to appear at its February meeting to show cause why the packerless permits for three other salt water disposal wells should not be revoked or modified. See Miss. Code Ann. § 25-43-13 (Supp. 1990). During the course of the hearings that followed, McGowan filed new applications for packerless permits in the Cranfield and LaGrange Fields in Adams County, proposed conforming amendments to his existing permits, and asked that packerless completions be authorized under the then-pending amendments to Statewide Rule 63. All of these matters were ultimately consolidated and heard by the Board over a period of several months.
At the hearings, McGowan offered extensive proof regarding the productivity and efficiency and safety of his packerless design, and, as well, his air pressure testing methodology. Witnesses in opposition  produced by Board staff, rather than third parties  addressed environmental concerns only. These witnesses did not concede the superiority of McGowan's design, but questioned primarily the Board's ability to test McGowan's wells and monitor environmental safety.
In the end, the Board entered a series of orders rejecting McGowan's packerless processes. On July 22, 1987, the Board acted as follows:
(a) Order No. 279-87, denied "by majority vote" McGowan's Petition for Authority to Recomplete, Work Over and Operate the Mrs. L.H. Eddy Heidelberg No. 1 Well for Salt Water Disposal.
(b) Order No. 280-87, denied "by majority vote" McGowan's Petition for Authority to Recomplete, Work Over and Operate the Mrs. L.H. Eddy Estate No. 1 Well for Salt Water Disposal.
(c) Order No. 281-87, granted "by majority vote" the Board's Motion to Consider the Revocation, Modification or Reissuing of Board Order No. 473-84 for the West Segment South Unit 1-14-2 Salt Water Disposal well in Tinsley Field, Yazoo County, Mississippi, "to require a packer to be placed in the referenced well... ."
(d) Order No. 282-87, granted "by majority vote" the Board's Motion to Consider the Revocation, Modification or Reissuing *315 of Board Order No. 616-84 for the Pickens Field  Yazoo County SWDW No. 1 Salt Water Disposal Well in Pickens Field, Yazoo County, Mississippi, "to require a packer to be placed in the referenced well... ."
(e) Order No. 283-87, granted "by majority vote" the Board's Motion to Consider the Revocation, Modification or Reissuing of Board Order No. 617-84 for the Pickens Field  Madison County SWDW No. 1 Salt Water Disposal Well in Pickens Field, "to require a packer to be placed in the referenced well... ."
(f) Order No. 284-87, denied "by majority vote" McGowan's Petition for Authority to Work Over and Operate the Ella G. Lees SWDW No. 32 Well Without a Packer, Cranfield Field.
Then, on December 16, 1987, the Board entered these further orders:
(g) Order No. 511-87, denied McGowan's Petition for Authority to Amend Order No. 213-85, which authorized packerless injection with certain restrictions and requirements in O.L. Wilson No. 6 Well, LaGrange Field.
(h) Order No. 512-87, denied McGowan's Petition for Authority to Amend Order No. 230-85, which authorized packerless injection with certain restrictions and requirements in O.L. Wilson No. 2 Well, LaGrange Field.
(i) Order No. 513-87, denied "by majority vote" McGowan's Petition for Authority to Operate Without a Packer the O.L. Wilson No. 1 Well, LaGrange Field.
(j) Order No. 514-87, denied "by majority vote" McGowan's Petition for Authority to Operate Without a Packer the O.L. Wilson No. 8 Well, LaGrange Field.
McGowan timely sought judicial review of each of these orders (and others not technically before us in the present proceeding) in the Circuit Court for the First Judicial District of Hinds County, Mississippi, in matters designated by seven separate docket numbers, but ultimately consolidated for hearing. In due course, the Circuit Court considered McGowan's application and, noting the Board orders appealed from were made on three-to-two votes, held in the end it should
accord to this agency a presumption of regularity and integrity and that [this] presumption has not been overcome by facts evident in this record. This Court is therefore duty-bound to adhere to the substantial evidence rule with regard to the central issue in these proceedings, whether the Board should permit further packerless completions at this time.
The Circuit Court then denied McGowan's application with respect to each of the orders noted above, but stayed the effectiveness of its ruling pending appeal to this Court.

III.
McGowan challenges the institutional processes of the State Oil and Gas Board. His complaint is that the Board was both his adversary and his judge. He struggles mightily to convince us we should strike this familiar feature of the administrative landscape, on grounds it offends due process, the right to which is secured to him by Art. 3, § 14 of the Mississippi Constitution of 1890, and ultimately by the Fourteenth Amendment to the Constitution of the United States. McGowan argues the idea implicit in the substantial evidence rule, one familiar expression of limited judicial review of agency action, is that an independent arbiter has found the facts and has applied the law.
We do not take the point lightly, for it is premised upon that ancient first principle of justice, that no man shall serve as judge of his own cause. Dr. Bonham's Case, 8 Co. 114a, 118a, 77 Eng.Rep. 646, 652 (1610); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955). Beyond its natural appeal, we find the principle a part of our jurisprudence in a variety of contexts. See, e.g., Bell v. City of Bay St. Louis, 467 So.2d 657, 662 (Miss. 1985); Danner v. Mid-State Paving Co., 252 Miss. 776, 786, 173 So.2d 608, 613 (1965), quoted in Chisolm v. State, 529 So.2d 635, 640 (Miss. 1988).
A few basics. Administrative agencies are ambiguous creatures born of necessity, *316 mired in the tension between public policy and personal claims of right.[2] They pursue pragmatically the public interest balancing the utilitarian (and expertly divined) calculus of aggregate net benefit against the individual's claim to fair opportunity and process.[3] They address pressing questions of political economy and science where there are seldom easy answers and almost never only two points of view. Our administrators also regulate and facilitate individual enterprise without which the public interest will surely suffer.[4] Here, as well, "the life of the law has not been logic; it has been experience."[5] And so we have shaped political structures that do not always resemble courts and committed to them processes not at all like the traditional adjudicatory process.[6]
McGowan's point is not new. See Dampier v. Lawrence County School District, 344 So.2d 130 (Miss. 1977). The leading case is Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In Withrow, the Supreme Court summarized:
The case law, both federal and state, generally rejects the idea that the combination of judging and investigating functions is a denial of due process.
Withrow, 421 U.S. at 52, 95 S.Ct. at 1467. Withrow went on to caution vigilance, that this combination of investigative and adjudicative functions in practice may on occasion present the Court on judicial review a compelling case for
determining from special facts and circumstances present in the case before it that the risk of unfairness is intolerably high.
Withrow, 421 U.S. at 58, 95 S.Ct. at 1470. See also, Harrison County School Board v. Morreale, 538 So.2d 1196, 1201-02 (Miss. 1989).
The Withrow Court noted that the Federal Administrative Procedures Act (APA)[7], precludes employees of agencies from adjudicating matters which they have investigated or prosecuted, although the provision exempts "the agency or a member or members of the body comprising the agency." In recent years, this state's administrative boards and agencies have shown an increasing sensitivity to the need to keep apart, as much as may practicably be done, investigatory and advocacy and decision-making functions. Most familiar are the public school boards which, in teachers' rights cases, routinely appoint an impartial hearing officer. See Miss. Code Ann. § 37-9-111 (1972, as amended). Notwithstanding, we continue to accept, for example, that the board that fired the teacher in the first place may later sit in judgment on his or her administrative appeal. See Harrison County School Board v. Morreale, 538 So.2d at 1200-03, and cases cited therein.
The Oil and Gas Board's investigatory/advocacy/decision-making functions most certainly are performed under the same agency aegis, intertwined as well with the Board's policy-making and policy-implementing *317 duties. Still, we are struck that, at least on paper today, the Board seems to keep appropriately separate these functions to a greater degree than is required by the APA. That act would allow some such functions to be combined in the same person under certain circumstances.[8] Under the Board's statutory framework, the five-member Oil & Gas Board sits as an entity with authority independent of that of the agency's supervisor and staff.[9] The Board members are present only for the hearings themselves. They deliberate and rule on the petitions brought before them in executive session. By law, each is charged to have and exercise independent judgment.[10]
McGowan insists back in 1987 certain Board members failed to respect their independence duties, and it appears on occasion this may have been so. McGowan's charges are pressed with verve and conviction, but in the end appear in substantial part outside the record and thus beyond our power of review. Besides, we are assured by counsel for the Board today greater safeguards insure the Board's independence from adversarial activities, a fact of consequence in view of the disposition we make below. Suffice it to say, we accept the Withrow premise that due process does place limits on the extent to which administrators may involve themselves in advocacy and decision-making vis-a-vis a regulated party.

IV.

A.
Against the backdrop of his institutional concerns, McGowan grudgingly concedes the limited scope of judicial review of the rulings of the State Oil and Gas Board. Assuming the overall process comports with the constitution, we have no authority to interfere unless one or more of the rulings at issue is (1) beyond the Board's legal power, (2) violates some constitutional right of the complaining party, (3) is arbitrary or capricious, or (4) is not supported by substantial evidence. See, e.g., Wright v. State Oil & Gas Board, 532 So.2d 567, 570 (Miss. 1988); Transcontinental Gas Pipeline Co. v. State Oil & Gas Board, 457 So.2d 1298, 1312 (Miss. 1984), rev'd on other grounds, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986); Damson Oil Co. v. Southeastern Oil Co., 370 So.2d 225, 229 (Miss. 1979); State Oil & Gas Board v. Crane, 271 So.2d 84 (Miss. 1972); Masonite Corp. v. State Oil & Gas Bd., 240 So.2d 446, 448 (Miss. 1970); Superior Oil Co. v. State Oil & Gas Bd., 220 So.2d 602, 603 (Miss. 1969); California Co. v. State Oil & Gas Board, 200 Miss. 824, 842, 27 So.2d 542, 546 (1946). Experience and reflection reveal considerable overlap among these grounds, as none of the four represents a discrete legal compartment, nor is any susceptible of a regimen of mechanical jurisprudence.
The Circuit Court was bound to respect these standards. As they partake of law and not fact, our review on final appeal is de novo. Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d 1238, 1240 (Miss. 1991).

B.

1.
McGowan says the Board's actions violated his constitutional rights, and he points again to his right to due process of law. McGowan's concern here is intra-hearing procedural due process. Assuming arguendo the Board's investigatory/advocacy/decision-making blend does not offend due process, he complains of the procedures the Board employed at his hearings. That he overstates his case should not blind us to the points he makes.
It is by now old hat that the rules of practice, procedure and evidence, formally *318 observed in courts of law, are relaxed in proceedings before administrative agencies. Most familiar are workers' compensation matters, where our statute law declares the proceedings
shall not be bound by common law or statutory rules of evidence or by technical or formal rules of procedure, except as provided by this chapter, ....
Miss. Code Ann. § 71-3-5 (1972); see also, MWCC Proc. Rule 8; Hercules, Inc. v. Walters, 434 So.2d 723, 726 (Miss. 1983); Sonford Products Corp. v. Freels, 495 So.2d 468, 473 (Miss. 1986). The premise is far broader and is a function of the nature of the administrative board or agency. See Part III above. The premise applies to all administrative or agency hearings, except where otherwise provided by statute. See, e.g., United Cement Company v. Safe Air For The Environment, Inc., 558 So.2d 840, 842 (Miss. 1990); Merchant v. Pearl Municipal Separate School District, 492 So.2d 959, 963 (Miss. 1986); New South Communications, Inc. v. Answer Hour, Inc., 490 So.2d 1225, 1227 (Miss. 1986); Hancock Bank v. Gaddy, 328 So.2d 361, 364 (Miss. 1976).
These things said, the Board was hardly free to proceed as it pleased. McGowan had important and valuable property rights at risk, and where this is so, common sense suggests a regimen of administrative adjudicatory fairness. Due process always stands as a constitutionally grounded procedural safety net in administrative hearings. See Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Shaughnessy v. United States, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); Georgia Pacific Corp. v. McLaurin, 370 So.2d 1359, 1361 (Miss. 1979). We accepted in McGowan I[11] that
Board rules must afford minimum procedural due process which is (1) notice, and (2) opportunity to be heard.
McGowan I, 542 So.2d at 248.
McGowan claims more, much more, and that he has no right to a full-blown trial with all the trappings does not mean we should turn a deaf ear. His procedural rights included the opportunity to present his evidence supporting packerless wells and as well
a reasonable opportunity to know the claims of the opposing party and to meet them.
Love v. Mississippi State Board of Veterinary Examiners, 230 Miss. 222, 230-31, 92 So.2d 463, 467 (1956).
Here the Board supervisor and staff were McGowan's adversary. The Supreme Court of the United States has given guidance how we ought regard such a circumstance. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938):
The answer that the proceeding before the Secretary was not of an adversary character, as it was not upon complaint but was initiated as a general inquiry, is futile. It has regard to mere form of the proceeding and ignores realities. In all substantial respects, the government was proceeding against the owners. The proceeding has all the essential elements of contested litigation, with the government and its counsel on the one side and the Appellants and their counsel on the other. It is idle to say that this was not a proceeding in reality against the Appellants when the very existence of their agencies was put in jeopardy.
Morgan, 304 U.S. at 20, 58 S.Ct. at 777, 82 L.Ed. at 1133.
We have little difficulty holding McGowan entitled to more than mere minimum due process. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) guides our thought of how much more. Mathews is in familiar form: the three part balancing test. It charges that we look at (1) the nature and weight of the public and private interests at stake, (2) the incremental change in risk of an erroneous decision, and (3) the incremental costs of added formality. Mathews, 424 U.S. at 335, 96 S.Ct. *319 at 903, 47 L.Ed.2d at 33. We accepted the Mathews formula and guidance in Natural Father v. United Methodist Children's Home, 418 So.2d 807, 810 (Miss. 1982).[12]
This backdrop addresses the forest. We move now to the trees. Not all of McGowan's procedural particulars possess merit, but some do. Not all merit comment, but some do.

2.
McGowan complains that, at the conclusion of the January, 1987, hearing, the Board "took the matter under advisement" and continued the hearing until a later date. He points to Board Rule 4 which provides:
Upon receipt of a proper request or application for hearing, the Board shall call a hearing within thirty (30) days, and after such hearing and with all convenient speed, and in any event within thirty days after the conclusion of the hearing, shall take action with regard to the subject matter thereof.
This rule but echoes the statutory mandate of Miss. Code Ann. § 53-1-29 (1972).
McGowan's argument is excessively legalistic. In the first place, the hearing was not concluded in January of 1987, but, even if it were concluded in a technical sense, the Board had the discretionary legal power to convene anew for additional testimony. In any event, the Board has the authority in matters as important as this to relax its own rule and reflect upon the matter for a reasonable time beyond the thirty day deadline. We have held the statute upon which Rule 4 is based directory and not mandatory and have refused to invalidate Board orders made later than thirty days after the conclusion of the hearing. State Oil & Gas Board v. Brinkley, 329 So.2d 512, 515 (Miss. 1976); Superior Oil Co. v. Foote, 214 Miss. 857, 883, 59 So.2d 85, 96 (1952). We reaffirm this view and extend it to the Board's stewardship of its own rule.
These things said, there is much that is disturbing in the apparent procedural handling of the Heidelberg petitions in January of 1987. McGowan insists that he was not aware his petitions would be opposed. Nothing of record suggests he is wrong in this. As he puts it in his brief:
McGowan announced ready at docket call, and no opposition was announced. He innocently offered his proof, and left.
Brief of Appellant, p. 19. The Board then "took the matter under advisement" while its staff developed opposition which was offered at the next Board meeting.
What is clear is that the Board and its staff were quite familiar with McGowan and his packerless modus operandi before this hearing. Until this point, the Board had approved, albeit provisionally. Fair play suggests McGowan should have been formally notified reasonably in advance of the January, 1987, hearing, if staff intended to oppose his application.[13] Common sense suggests the sort of proof one offers upon a pro forma application to an administrative agency is qualitatively different from the sort of proof one marshals when one knows there is staff opposition. Moreover, when the Board took the matter under advisement and decided to continue the hearing, it never formally noticed McGowan of this fact and refused to afford him access to the witnesses and proof it intended to offer in opposition, leading to satellite litigation in the Chancery Court of Hinds County and in this Court, see McGowan I, which should never occur among people who are behaving as they ought. The Circuit Court understated the matter when it said:
The Board's methodology in this instance does not exhibit the kind of fair play that *320 the public has a right to expect of its administrative agencies.

3.
McGowan renews his McGowan I discovery point. He argues the Board kept from him that it had retained the services of Ken E. Davis and planned to present him as an expert witness in opposition to packerless wells at the reconvened hearing in February. McGowan admits he got wind of what was going on through someone in the Attorney General's office.
We have addressed the technical point in McGowan I. We are not about to predicate reversal on this point of administrative procedure. Still we do not see how it advanced the Board's search for the truth about packerless salt water disposal wells that McGowan be given less than full opportunity to test and examine the evidence, particularly that of experts staff planned to present. It is but common sense that counsel so circumstanced needs reasonable advance notice and opportunity to prepare to examine a witness such as Davis and to develop evidence, including finding further experts, who might see things differently. That what McGowan sought would have worked no hardship is evidenced by the Board's new processes which afford such notice.[14]

4.
McGowan is offended that the Board received and considered letters from major oil companies and individuals expressing expert opinions. We have letters as well from administrative officers of other states.[15] These letters suggest that packerless operations are not well regarded and the consent to operate an oil well without one is always accompanied by stringent conditions. McGowan pressed the point before the Circuit Court which denied it, ruling
An administrative agency may receive hearsay evidence where it is corroborated or where there is other satisfactory indicia of reliability.
*321 We agree. This matter of administrative procedure was settled adversely to McGowan's position in New South Communications, Inc. v. Answer Iowa, Inc., 490 So.2d 1225 (Miss. 1986), and we have no disposition to revisit it.
It bears re-emphasis, while the hearing regarding McGowan's right partakes of a quasi-judicial flavor, there is a quasi-legislative dimension to the process, as well. The Board in a very real sense was in these proceedings addressing a question of great public import. Within the tension of its dual duties to prevent waste and guard against environmental hazards, the Board was charged to decide whether packerless completions will be allowed in this state, and, if so, on what conditions. Whatever else it is doing, the Board is engaged in a search for the legislative facts, those facts which would enable it competently and intelligently to balance the competing interests of enhanced oil production and protection of USDW from salt water contamination. To this end, our law mandates the Board consider all available information and opinions and that the form of some of it does not fit neat descriptions familiar to the adjudicative function goes at most to the weight it should be accorded. See Jones v. Pascagoula Municipal Separate School District, 524 So.2d 968, 973 (Miss. 1988); Merchant v. Pearl Municipal Separate School District, 492 So.2d 959, 964 (Miss. 1986); Noxubee County Board of Education v. Givens, 481 So.2d 816, 820 (Miss. 1985). None of this is at odds with the rule of rudimentary fairness. Hercules, Inc. v. Walters, 434 So.2d 723, 724 (Miss. 1983); Love v. Mississippi Board of Veterinary Examiners, 230 Miss. 222, 230, 92 So.2d 463, 467 (1956).

5.
There are more, but some of McGowan's points  such as that the Board refused to enforce "the rule" on sequestration of witnesses  are a bit much. Still, the process in the aggregate seems lacking and we think back to the Mathews formula. Unfortunately, we have not been favored by a competent briefing of the Mathews balancing test. In the circumstances, we may only hold McGowan has not convinced us the proceedings below offended his procedural due process rights.
This is not to say we are any more impressed with (some of) what happened below. We note the Board has substantially enhanced its procedural schema since McGowan's hearings in 1987. At oral argument, the Board's counsel advised
most of the things that he argues should have been done from a procedural stand-point during that hearing are done routinely right now before the Board.
Counsel for McGowan conceded as much. Our independent review and reflection upon the Board's new rules suggest this may be so,[16] and we applaud the Board's progress. These points, coupled with the disposition we make below, make it unnecessary that we subject the Board's 1987 procedures to ultimate Mathews scrutiny.

V.
McGowan charges that the Board's actions were arbitrary and capricious, and when he does so he is careful to emphasize that this charge is substantially interrelated with his other complaints, first, that he was denied intra-hearing procedural due process and, prior thereto, that the Board behaved in an institutionally impermissible manner. We, too, accept the interrelatedness of the claims and would note further a not-inconsiderable relation to the substantial evidence rule.[17] We have recently written:
These familiar standards, though not synonymous, overlap sufficiently that we often consider them simultaneously.
Riddle v. State Board of Pharmacy, 592 So.2d 37, 41 (Miss. 1991). Of importance, judicial review under either or both of these standards is necessarily a function of *322 the court's ability to divine with confidence what the Board has done and how it has done it. Implicit in this review regimen is a distinct disenchantment with the intuitionist style of so much agency decision making.
Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d 1238 (Miss. 1991) speaks of the arbitrary-and-capricious standard in administrative law.
The terms "arbitrary" and "capricious" are
open-textured and not susceptible of precise definition or mechanical application. We find helpful meanings North Carolina has assigned in a not-dissimilar context:
"Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,  absolute in power, tyrannical, despotic, non-rational,  implying either a lack of understanding of or a disregard for the fundamental nature of things.
"Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles... . [Citation omitted]
Dept. of Health, 580 So.2d at 1240. The reviewing court is charged to study the record and the legislative facts to which the challenged order points and divine a rational basis upon which the administrator may have acted. The standard invokes the rule of relevant resemblances and proscribes unprincipled discrimination between and among those similarly situated. It condemns ad hoc decision-making and, because it is a standard of judicial review, imports an imperative that administrators say at least minimally why they do what they do so someone can see whether it be arbitrary or capricious.
This criteria imports as well substantive standards, without which the entire process would be arbitrary and capricious and alegal. We look to our legislature which has made its judgment and has declared it the policy of this state
to protect the public and private interests against the evils of waste in the production and utilization of oil and gas, by prohibiting waste as herein defined; ... .
Miss. Code Ann. § 53-1-1 (1972). Employing the sovereign prerogative, the legislature has defined "waste" and has brought within "waste," inter alia,
the ... equipping, operating or producing of any oil or gas well or wells in a manner which results or tends to result in reducing the quantity of oil or gas ultimately to be recovered from any pool in this state.
Miss. Code Ann. § 53-1-3(l)(1) (1972 and Supp. 1991). To this end, the legislature has, inter alia, created the Board and has empowered and directed that it make
such reasonable rules, regulations and orders as may be necessary from time to time ... to prevent waste as defined herein.
Miss. Code Ann. § 53-1-17(c)(1) (1972).
What is important is that this same act directs the Board pursue another policy. Section 53-1-17(c)(1) tells the Board "to prevent pollution of freshwater supplies by oil, gas, or salt water" and to that end, as well, make "such reasonable rules, regulations and orders as may be necessary."
It requires little thought or reflection to see that we have been given two goals  public policies, if you will  rationally and practically at odds with one another. Considerable scientific, engineering and technical expertise must inform any intelligent evaluation of waste and environmental hazard in the context of a particular producing oil well. Policy must inform the balance finally struck and, since the property and enterprise of citizens are greatly affected, procedural fairness must be served.
We have in a wide variety of contexts recognized the role of expertise in the administrative agency. See, e.g., Grant Center *323 Hospital v. Health Group of Jackson, Miss., Inc., 528 So.2d 804, 810 (Miss. 1988); Eidt v. City of Natchez, 421 So.2d 1225, 1231 (Miss. 1982); Colonial Savings and Loan v. Security Savings and Loan Assoc., 288 So.2d 857, 859 (Miss. 1974); First National Bank of Vicksburg v. Martin, 238 So.2d 856, 858 (Miss. 1970). The existence within government of discrete areas of quasi-legislative, quasi-executive, quasi-judicial regulatory activity in need of expertise is the raison d'etre of the administrative agency. Because of their expertise and the faith we vest in it, we limit our scope of judicial review.
Our concern this day is that the Board has not exhibited its expertise. The several McGowan hearings presented the Board with wormy questions that interlaced policy, science and adjudicatory fairness. We have before us a substantial record with much testimony and rhetoric that packerless wells prevent waste. They do this, we are told, through enhanced economic feasibility of production in the oil well's latter days. We are told, as well, that packerless wells are not only safe, but that they can be adequately tested and monitored, though this is contradicted by other opinion testimony.
We know that the Board rejected McGowan's packerless wells, but we are not quite sure why. In the face of conflicting policy imperatives and (particularly on the environmental issues) conflicting testimony, the Board acted, but we do not know what it was about the evidence opposed to packerless wells that persuaded the Board. What we have before us is a series of orders which, in the most conclusory terms, recite that the Board has received "numerous hours of testimony and numerous dockets, exhibits and other evidence which have been thoroughly and exhaustively considered," by reason of which it ruled against McGowan. On each occasion the Board acted "by a majority vote," and the record reflects that this means a three-to-two vote. We certainly will accord a three to two vote the same deference as five-to-nothing. Still, the closeness of the vote goes to emphasize our need for understanding the reasons why the Board ruled as it did, else how can we determine whether the Board acted arbitrarily or capriciously and/or whether substantial evidence undergirds its actions.
It cannot be overemphasized, legislative policy mandates that the Board eliminate waste and USDW pollution,[18] nor are we told which trumps. Of course, the policies compete, and unreasoned preference of one by definition is arbitrary. In any such competition there are, always have been, and always will be losers. We are never going to prevent all waste, nor are we going to eradicate all environmental hazards. We need to know something of the costs and risks associated with each of these conflicting interests before we can on judicial review intelligently consider whether the Board acted arbitrarily and capriciously or whether its decision was supported by substantial evidence. We need to know how the Board regarded the social costs of packerless wells and the extent of the attendant reduction in waste vis-a-vis the social cost of requiring packers and the attendant reduction of risk of USDW pollution.
Make no mistake about it, the several inarticulate orders here under review are far more global than John W. McGowan v. State Oil and Gas Board. They establish statewide policy.[19] This implies a more massive externality problem in which all entrepreneurs who demonstrate ability and expertise may pursue packerless wells. *324 The Board must as well consider the costs and risks to all who consume and benefit from USDW. If it should be that the measurable losses attributable to contaminated USDW exceed the benefits of packerless wells, the Board's orders should be sustained. On the other hand, if perchance packerless well benefits should exceed contaminated USDW costs, it would be difficult to imagine on what rational basis the Board decided as it did, assuming only that it sought and considered data and expert opinions of adequate quality. Our concern of the moment is that the Board has given us nothing suggesting it ever thought of these points, much less decided them.
Consistent with "relaxation," we have no thought of imposing any procedural duty that will not be cost effective. See Mathews v. Eldridge, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33 and Part IV(B)(2) above. Still, we have often noted
The greater weight of authority holds it to be better form for a fact finding administrative agency or commission to make a finding of facts on which ... [it] base[s] ... [its decision].
Rivers Construction Co. v. Dubose, 241 Miss. 527, 536, 130 So.2d 865, 869 (1961), quoted in Fortune Furniture Manufacturing Co., Inc. v. Sullivan, 279 So.2d 644, 647 (Miss. 1973). On judicial review of a Mississippi Public Service Commission order setting freight rates, we told the Commission to make findings of ultimate fact, Illinois Central Railroad Co. v. Jackson Ready-Mix Concrete, 243 Miss. 72, 83-85, 137 So.2d 542, 545-46 (1962), and en route repeated the obvious:
If an agency does not disclose the reason upon which its decision is based, the courts will be usurped of their power of review over questions of law.
Illinois Central, 243 Miss. at 83-84, 137 So.2d at 545. Among those questions of law are whether board action is arbitrary and capricious and whether it is supported by substantial evidence.
Our concerns in summary are two-fold. First, findings. The Board has made at best a minimal, implicit finding on the environmental hazard the law puts in its charge (though we do not know whether its concern is substantive safety or ability to test and monitor), but the Board has said nothing on the waste issue. It is a logical and legal prerequisite to intelligent judicial review in these cases that the Board favor us with more than mere conclusory findings on each of these issues, together with a summary of the grounds for these findings.
Second, and equally important, we have before us two competing policy imperatives. We need as well the benefit of the Board's balancing of these and articulation of the reasons why it finds one overpowering the other. Otherwise, we may not know or even begin to consider whether the Board's orders be arbitrary or capricious.
There may, of course, have been more local reasons for the Board's actions. For example, the rejections may have been the product of applicant-specific deficiencies, such as McGowan's inability to provide adequate evidence that he can do what he says he can do. Again, we do not know by reason of the Board's lack of findings or explanation.

VI.
We vacate the orders below and remand to the State Oil and Gas Board. The Board may reopen, a course we encourage (but do not require) in view of the improved procedures the Board has implemented since 1987. Or, the Board may proceed as all concerned may agree, or as may otherwise be appropriate. The Board may, if it deems it appropriate, stand by its prior orders, provided only that it make more than conclusory "written findings of fact and conclusions of law setting forth the reasons for the Board's decision."[20] Nothing said here implies so much as a hint what the Board should do, so long as its *325 further proceedings are not inconsistent with this opinion.
VACATED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN, and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
BANKS, J., not participating.
NOTES
[1] At the time the Board's Statewide Rule 63, Underground Injection Control, preferred use of a packer but provided the Board could authorize packerless exceptions upon application, notice, hearing and proper showing.
[2] See e.g., C. Sunstein, After the Rights Revolution: Reconceiving the Regulatory State 48-71 (1990); A.C. Aman, Jr., Administrative Law in a Global Era: Progress, Deregulatory Change, And The Rise of the Administrative Presidency, 73 Cornell L.Rev. 1101 (1988).
[3] R. Posner, Economic Analysis of Law 572-74 (3d ed. 1986).
[4] S. Breyer, Regulation and Its Reform (1982).
[5] Holmes, The Common Law 1 (1881).
[6] Due to the specialized nature of many of their functions, it has long been accepted that as much as possible, courts of law should defer to the findings of administrative agencies. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). But this deference must always be handled with caution. R. Pierce, S. Shapiro & P. Verkuil, Administrative Law and Process ix (1985) ("Although the courts will defer to some extent in ... review functions, judicial review sets an outer limit beyond which agency discretion may not be exercised."). For an excellent discussion of many of the tensions which accompany the review of administrative agency decisions, see generally, C. Edley, Administrative Law: Rethinking Judicial Control of Bureaucracy 96-130 (1990). See also S. Breyer, Judicial Review of Questions of Law and Policy, 38 Admin.L.Rev. 363 (1986).
[7] Withrow, 421 U.S. at 52, 95 S.Ct. at 1467. See also Administrative Procedure Act (APA), 5 U.S.C. § 554(d)(1988); 2 K. Davis, Administrative Law Treatise §§ 13.06-13.07 (1958).
[8] See Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(E) (1988); see also 2 K. Davis, Administrative Law Treatise § 13.11 (1958).
[9] See Miss. Code Ann. § 53-1-5(1) (1972 and Supp. 1991).
[10] See Miss. Code Ann. § 53-1-5(3) (1972 and Supp. 1991).
[11] The reference is to State Oil & Gas Board v. McGowan, 542 So.2d 244 (Miss. 1989), an earlier appeal arising from the controversy at the core of today's case.
[12] For a more complete discussion of the Mathews balancing test, see Jerry L. Mashaw, The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews v. Eldridge: Three Factors in Search of a Theory of Value, 44 U.Chi.L.Rev. 28 (1976).
[13] Because the Board may not act arbitrarily or capriciously, the Orders under review have the practical effect of a rule prohibiting packerless completions. Had the Board proceeded formally to adopt such a rule, McGowan and other affected persons would have been entitled to thirty days public notice of the Board's plans. Miss. Code Ann. § 25-43-7(1) (Supp. 1990).
[14] See Rule 6(B), Rules of Order and Procedure Before Board, State Oil and Gas Board (November, 1990).
[15] Summarized, the letters provide:

EPA
United States Environmental Protection Agency, Region IV, Atlanta, Georgia  letter dated March 18, 1987. The EPA advised the State Oil and Gas Board that packerless wells are largely experimental and do not provide an environmental assurance level as high as standard wells.
KANSAS
In a letter dated June 4, 1987, the Intergovernmental Coordinator of the Kansas Corporation Commission wrote the State Oil and Gas Board informing them of the approval procedure on the operation of packerless wells. This letter merely copied to the Board the applicable Kansas regulations on the relevant approval procedure, which is subject to a six-part test. These internal regulations were promulgated under the authority of K.S.A. 55-152 (Supp. 1991), which confers on the Commission the mandate to protect the usable water of the State of Kansas from any actual or potential pollution from oil wells. The scientific tests formulated by the Kansas Corporation Commission address such questions such as injection pressure, the depth of the tubing, annulus pressure and frequency of continuing oversight once the permission to operate an oil well without a packer is given.
LOUISIANA
The protection of usable underground water in Louisiana is delegated to the Department of Natural Resources. On May 26, 1987, they wrote the Mississippi State Oil and Gas Board on the matter of packerless wells. The operation of packerless wells is the exception, and not the norm, and consent to operate one is subject to case by case evaluation, since the technology is still considered experimental.
THE OIL INDUSTRY
Five letters addressed the point:
1. National Institute for Petroleum and Energy Research, Bartlesville, Oklahoma  letter dated March 16, 1987. Packer completion assures better protection of underground sources of drinking water.
2. Chevron U.S.A. Inc.  letter dated February 4, 1987. Chevron emphasized that its use of packers in their operations is in obedience to Texas Railroad Commission Rule 9(h)(1).
3. Texaco USA  letter dated February 10, 1987  informing the State Oil and Gas Board of the use of packers in its oil operations in Texas, Oklahoma and Kansas.
4. Mobil Oil Exploration & Producing Southeast Inc.  letter dated March 12, 1987. Again, underlining the value of packers and where it is not possible to install one for one reason or another, permission to operate without one must be secured.
5. Conoco  letter dated February 10, 1987. In endorsing the use of packers, Conoco emphasized its commitment to an "environmentally safe industry."
[16] See Rules of Order and Procedure Before Board, State Oil and Gas Board (November, 1990).
[17] McGowan says the Circuit Court's consideration of the other points he raises was so deficient that we never get to the question of whether there was substantial evidence to support the Board's rulings.
[18] All that we say in this part accepts, as well, that the Board and this state may be subject to superior federal authority in the premises.
[19] Interlaced with the Orders here under review is the Board's September 17, 1987, Order No. 395-87 amending Statewide Rule 63 regulating Underground Injection Control. The amended rule prohibits packerless salt water disposal wells, subject only to a general exception clause, which mentions neither packerless completions nor air pressure testing. Order No. 395-87 is consistent with the several individuated McGowan orders noted above and suffers the same infirmities  the lack of findings or balancing. The Circuit Court vacated this Order on August 5, 1988. Effective April 20, 1989, the Board adopted a new, amended Rule 63 "supersed[ing] Order No. 395-87."
[20] We think it important that the Oil and Gas Board has by rule provided that a party may, upon request, receive "written findings of fact and conclusions of law setting forth the reasons for the Board's decision." Rule 10(A), Rules of Order and Procedure, Oil and Gas Board.