RANDOLPH, Justice,
Dissenting.
¶ 30. I dissent from the majority’s determination that the Mississippi Division of Medicaid erred in interpreting Mississippi Code Section 43-13-117(44)(b) (Rev.2004). Giving the agency’s interpretation the “great deference” as is proper under our standard of review, I find that the rule is consistent with the statutory language at issue. See Sierra Club v. Miss. Envtl. Quality Permit Bd., 943 So.2d 673, 678 (Miss.2006).
¶ 31. The majority’s determination that Medicaid’s rulemaking was arbitrary and capricious (as opposed to reflecting sound judgment and common sense) allows *611 Methodist Hospital and Rehabilitation Center unbridled authority to shift costs and set administrative salaries and expenses at its whim, and simply hand the amplified bill to our state’s taxpaying citizens’ representatives and demand satisfaction of its Brobdingnagian appetite. Is Medicaid to be castigated for its decision and determination that the nursing facility’s administrative and operating costs were unreasonable, given that Methodist’s overall reimbursement rate was nearly seven times greater than that of a standard skilled-nursing facility (“SNF”), and given that Methodist was billing twice the average daily rate of an SNF for administrative and operating costs? Such a decision does not facially appear to be “tyrannical [or] despotic,” or “freakish, fickle, or ... done without reason, in a whimsical manner....” McGowan v. Miss. State Oil & Gas Bd., 604 So.2d 312, 322 (Miss.1992). The majority opinion fails to acknowledge that Medicaid properly did not contest the expected enhanced costs for the necessary skills and equipment to serve and care for the needs of Methodist’s severely impaired residents. Reimbursements for direct care, therapies, and care-related expenses remain on a basis of cost, plus the applicable trend factors.
¶ 32. Regarding issue two, Methodist asserts that Medicaid violated the notice requirements of the Administrative Procedure Act (“APA”) by failing to send Methodist a copy of the proposed rule change. See Miss Code Ann. § 25-43-3.103 (Rev.2004). However, that provision is inapplicable here; Methodist had never requested to be on the mailing list, as required by the statute. See Miss. Code Ann. § 25-43-3.103(2) (Rev.2004). Assuming arguendo that it applies, the APA does not allow for voiding a rule under these circumstances. See Miss.Code Ann. § 25-43-3.111(1) (Rev. 2004) (“Inadvertent failure to mail a notice of proposed rule adoption to any person as required by Section 25-43-3.103(2) does not invalidate a rule”). Of greater import, Methodist was accorded due-process rights for a hearing. Rather than appear and contest this rule, Methodist chose, as was its right, to submit a written complaint to a Medicaid hearing officer, whose decision then required acceptance or rejection by the Executive Director; and finally, by a chancellor. I find this issue to be -without merit.
¶ 33. Methodist raises a third issue in its brief — that Medicaid had violated the notice provisions of its own regulations— but Methodist failed to list this issue in its “Statement of Issues.” Thus, we need not consider this issue. See M.R.A.P. 28(a)(3). Once again, assuming arguendo, the issue was properly preserved, it is without merit. Medicaid’s notice requirements have no provision to invalidate a rule on this basis.
¶ 34. The chancellor fully considered the issues and found that “Methodist ha[d] not met its burden of proof that the final decision was unsupported by substantial evidence, arbitrary or capricious, in excess of the statutory authority or jurisdiction of Medicaid, or a violation of any vested constitutional rights of any party involved.” The chancellor concluded that his court would “not substitute its own judgment” for that of Medicaid, the agency charged with implementing the statute. This Court should exercise the same restraint, which we have imposed on ourselves previously. See Elec. Data Sys. Corp. v. Miss. Div. of Medicaid, 853 So.2d 1192, 1204 (Miss.2003) (citing State Bd. of Psychological Exam’rs v. Coxe, 355 So.2d 669, 671 (Miss.1978)).
¶ 35. The chancellor found that SPA 2006-006 was not inconsistent with the statutory mandate of Mississippi Code Section 43 — 13—117(44)(b) (Rev.2004). The *612 chancellor astutely recognized that Methodist was not subject to any ceilings for direct-care or care-related costs, and that the new ceilings applied only to administrative and operating costs. He noted that the plain language of the statute does not prevent Medicaid from referring to the criteria for other categories of nursing facilities to establish a proper reimbursement formula for Methodist. The chancellor concluded that Methodist was “still treated as a separate class of facility as required by law.”
¶ 36. Our precedent requires us to give “great deference” to statutory interpretations done by administrative agencies concerning their governing statutes. Sierra Club, 943 So.2d at 678. “[N]o court can hope to replicate” an agency’s “familiarity with the particularities and nuances of the problems committed to its care....” Gill v. Miss. Dep’t of Wildlife Conservation, 574 So.2d 586, 593 (Miss.1990). Further, “this Court has no right, prerogative, or duty to bend a statute to make it say what it does not say.... [Cjourts, judges, and justices sit to apply the law as it is, not make the law as they think it should be.” Franklin Collection Serv., Inc. v. Kyle, 955 So.2d 284, 288-89 (Miss.2007).
¶ 37. The statutory language at issue is silent on the specific issue here. See Miss. Code Ann. § 43-13-117(44)00 (Rev.2004) (“a separate category of nursing facilities”). The chancellor found that “the plain language to the statute [did] not support [Methodist’s] assertion.” I agree with this finding. Under the rule, Methodist is not subject to any ceilings for direct-care or care-related costs. Thus, for these costs — those that are increased because of the treatment of severely-disabled patients — Methodist will continue to be reimbursed on a “cost-plus” basis. That is, Methodist will get everything it claims and more, as the total claimed costs are multiplied by a “trend factor.”[7] Under the rule, Methodist would be subject only to a ceiling for administrative and operating costs, with no ceiling on costs related to direct care for patients. Medicaid points out that when Methodist was appointed as a provider, effective February 27, 2004, Medicaid set the interim rate based on estimated funding by Methodist, at a daily rate of $487.74 for all costs. Ten months later, Methodist submitted its initial cost report projecting $1,106.68, of which $454.42 was for administrative and operating costs. Medicaid accepted the high care costs related to the special-need patients, but at the same time determined that Methodist’s administrative and operating costs should be comparable to those of a similarly-sized nursing home.
¶ 38. Methodist argues that the “separate category” language requires that it not be subject to any ceiling, for any of its costs, and that comparison to another type of facility cannot be any part of its reimbursement formula.[8] As the statute is silent, I cannot in good conscience accept Methodist’s interpretation. One has to amend the statutory language to get to this desired result. I decline. Methodist accuses Medicaid, unconvincingly, of seeking to add statutory language. Methodist argues that an administrative-and-operating exception should be treated as a separate category. The statute has no such *613 exception. Medicaid has accorded a fair interpretation of the statute, and we, like the chancellor, owe Medicaid’s interpretation “great deference.”
¶ 39. Methodist argues also that the statute requires Medicaid to tailor a reimbursement scheme to Methodist’s particular role as a private nursing facility for the severely disabled (“PNFSD”). The rule precisely accomplishes the statutory requirement, albeit in a different way than did the prior reimbursement rule, which granted Methodist carte blanche. Methodist was reimbursed for all of its expenses on a “cost-plus” basis, taking into consideration the high costs of the facility’s special functions of caring for persons with severe disabilities. Under the new rule, Methodist continues to receive “cost-plus” reimbursement for the high direct-care and care-related costs, subject only to a ceiling for administrative and operating costs.
¶ 40. The majority parrots Methodist’s argument that Medicaid’s interpretation, if taken to its logical conclusion, would yield absurd results in futuro. The claim is that if we defer to this interpretation, nothing would stop Medicaid from placing ceilings on direct-care and care-related costs. Should this imaginary concern develop, we will deal with it when it is properly before the Court. We are precluded from ruling on controversies not presented. See Gartrell v. Gartrell, 936 So.2d 915, 917 (Miss.2006) (citing McDaniel v. Hurt, 92 Miss. 197, 41 So. 381 (1906)).
¶ 41. The citizens of this state who pick up the tab for government services are entitled to have the expenses monitored by the government they put into power, and not by the whim of a vendor of services. Administrative and operating costs include such items as the salaries and fringe benefits of the administrator and assistant administrator, as well as other labor costs such as: dietary, housekeeping, laundry, maintenance, medical records, and other personnel. Other costs in this category include noncapital amortization and depreciation fees for vehicles. Does Methodist pay its housekeepers, maintenance staff, and laundry workers more than other health-care providers? Is its secretarial staff compensated differently, or its food costs higher, or do they pay a higher rate for them utilities and vehicles? Medicaid certainly has a right, a duty, to analyze these costs. When it does, we should not interfere.
¶42. Should a government agency be prohibited from “tightening its belt,” as many Mississippians are having to do during this time of high unemployment and economic uncertainty? Cost control is important to all Mississippians, and is essentially important to the other beneficiaries of Medicaid, our poor and disadvantaged.
¶ 43. Statistics provided by Medicaid demonstrate the differences between Methodist’s reimbursement and those of facilities in other categories: “For skilled nursing facility care, the average per diem reimbursement rate paid by Medicaid is $169.03.... At $511.01, Methodist’s total rate as calculated by Medicaid is clearly distinguishable from the rates of other nursing facilities.”
¶ 44. Our statute authorizes Medicaid to make payments, including those for the severely disabled, as follows:
Medicaid as authorized by this article shall include payment of part or all of the costs, at the discretion of the division, with approval of the Governor, of ... care and services rendered to eligible applicants who have been determined to be eligible for that care and services, within the limits of state appropriations and federal matching funds.
*614 Miss.Code Ann. § 43-18-177 (Rev.2004). Here, Medicaid adopted a rule concerning administrative and operating costs. The rule change does not result in a ceiling on costs for the patients’ care, but affects only the administrative and operating expenses of the facility. The expenses subject to a ceiling are costs that any nursing home expends (accounting fees, bank service charges, dietary supplies, utilities), as well as others that are less essential (educational seminars, travel, and home-office expenses), and those in between (administrative salaries and fringe benefits). Cost cutting, not in violation of a statute, is laudable, and should not be micromanaged by this Court. “[T]he everyday experience of [Medicaid] gives it familiarity with the particularities and nuances of the problems committed to its care [that we cannot] hope to replicate.” Gill, 574 So.2d at 593.
¶ 45. Therefore, considering the great deference we should rightly give to an agency’s interpretation of its governing statutes, I would affirm the holdings of the administrative hearing officer, Medicaid, and the chancellor.
LAMAR, J., JOINS THIS OPINION.

. For the year from July 2004 through June, 2005, the trend factors called for the following increases over actual costs: Direct Care, 10.575%; Therapy, 11.125%; Administrative and Operating, 21.775%.

. Reference to other categories to compute Methodist’s reimbursement is not unprecedented. For one aspect of its reimbursement formula, return on equity, Methodist has been paid at the same rate as other nursing facilities since Methodist first opened its PNFSD.