**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2000-CC-01543-SCT**

*PUBLIC EMPLOYEES' RETIREMENT SYSTEM*

*v.*

*MARCIA F. HOWARD*

**ON MOTION FOR REHEARING**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/31/2000 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARY MARGARET BOWERS |
| ATTORNEY FOR APPELLEE: | GEORGE S. LUTER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND REMANDED -06/23/2005 |
| MOTION FOR REHEARING FILED: | 12/12/2003 |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Appellee's second motion for rehearing is granted. The prior opinions are withdrawn, and this opinion is substituted therefor.

¶2.     On August 26, 1997, the Public Employees' Retirement System (PERS) received an application for "line of duty" disability benefits from Marcia F. Howard.     Howard's application[1] was denied by the PERS Medical Board (Medical Board) because there was

_____

[1]Even though Howard initially filed for line of duty disability, she was allowed at the hearing to amend her application to include regular disability, although on closing argument, Howard's attorney mentioned only line of duty.   The primary difference between the two types of disability is that "regular" disability is only available to those who have four years of membership credit, while "disability

insufficient objective evidence that her medical condition prevented her from performing her duties as a teacher. Howard appealed and received a hearing before the PERS Disability Appeals Committee (Appeals Committee) in May of 1999. Three months later, the Appeals Committee recommended that Howard be found *not* permanently and totally disabled. The PERS Board of Trustees approved and adopted this recommendation by order dated October 26, 1999. Howard appealed to the Circuit Court of the First Judicial District of Hinds County, which held that PERS's decision was against the weight of substantial evidence and was arbitrary and capricious. Accordingly, the circuit court reversed the decision of the Board and awarded Howard disability status retroactively to January 1997.

¶3. PERS appeals from that judgment and raises three issues for review:

I. **WHETHER THE CIRCUIT COURT ERRED IN REWEIGHING THE FACTS AND SUBSTITUTING ITS JUDGMENT FOR THAT OF THE ADMINISTRATIVE AGENCY IN FINDING HOWARD IS ENTITLED TO THE RECEIPT OF DISABILITY BENEFITS.**

II. **WHETHER THE CIRCUIT COURT ERRED IN DETERMINING THAT HOWARD PRESENTED SUBSTANTIAL EVIDENCE OF DISABILITY AND THAT THE DECISION OF THE BOARD OF TRUSTEES IS ARBITRARY AND CAPRICIOUS.**

---

in the line of duty" has no similar time restriction. In addition, line of duty benefits are greater than regular benefits. The order from the PERS Board denying disability adopts the PERS Committee's findings of fact and conclusions of law based on Miss. Code Ann. # 25-11-113, which governs only regular disability. The order from the circuit court reversing the Board also mentions only Section 113, as did Howard's brief submitted to that court. Howard now argues in the alternative that this Court should affirm the circuit court's decision and remand the case to PERS to decide if Howard is entitled to line-of-duty or regular benefits. Howard did not, however, raise that issue in her appeal to the circuit court and thus is procedurally barred from raising it before this Court.

**III.  WHETHER THE CIRCUIT COURT ERRED IN AWARDING DISABILITY STATUS TO HOWARD RETROACTIVE TO JANUARY 1997, AS SUCH VIOLATES THE DICTATES OF THE STATUTORY LAW GOVERNING THE RETIREMENT SYSTEM.**

¶4.     Concluding that PERS's appeal is well taken, we reverse and remand with instructions that not only should Howard submit to an evaluation by a physician or physicians of PERS's choice,[2] but also she has the right to have an updated evaluation made by physicians of her choice, as further discussed in the Conclusion of this opinion.

**FACTS**

¶5.     Marcia F. Howard was a teacher in the Hancock County School District with 12.25 years of PERS service.  Her application for disability retirement indicates that she was last employed on January 28, 1997; however, she did not terminate her employment until July. Howard's application was not received by PERS until August 26 of that same year.

¶6.     There are two categories of disability benefits available to PERS members.  On her application, Howard checked the box indicating "hurt on the job".   In the statute, hurt on the job disability is called disability in the line of duty as follows:

> Regardless of the number of years of creditable service upon the application of a member or employer, any active member who becomes disabled as a direct result of an accident or traumatic event resulting in a physical injury occurring in the line of performance of duty, provided the medical board or other designated governmental agency after a medical examination certifies that the member is mentally or physically incapacitated for the further performance of

---

[2] Subsequent to the original opinion in this case, Miss. Code Ann. § 25-11-113 (1)(a), the applicable statutory provision, was amended.  This substituted opinion applies the statute as it existed at all times beginning with the filing of Howard's application through the time of publication of this Court's initial opinion.

duty and such incapacity it likely to be permanent, may be retired by the board of trustees . . . .

Miss. Code Ann. § 25-11-114(6) (Supp. 2001). Regular disability is the term used for disabilities not caused in the line of duty, and the statutory provision for it reads as follows:

> Upon the application of a member or his employer, any active member in state service who has at least four (4) years of membership service credit may be retired by the board of trustees . . ., provided that the medical board, after a medical examination, shall certify that the member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that the member should be retired . . . .

Miss. Code Ann. § 25-11-113(1)(a) (1999).[3]

¶7. In December of 1995, Howard had undergone back surgery for an injury sustained in an automobile accident. After recuperation, she returned to work in April of 1996. Later that year on September 26, 1996, Howard was injured at school when a student slammed a steel door into her face and chest, then into her back and the back of her head and neck. Howard testified that the student threatened her life, saying "that he would kill me and that he would get me, if not that day, some day, . . . ." Howard did not see a doctor until the next day,

---

[3] The original opinion in this case was issued on February 7, 2002. Section 25-11-113(1)(a) (regular disability) was amended, effective July 1, 2002. The amendment changed the provision that previously stated "the medical board, *after a medical examination*, shall certify . . ." to read "the medical board, after *an evaluation of medical evidence that may or may not include an actual physical examination by the medical board*, shall certify. . ."

Section 25-11-114(6) (line-of-duty disability) was not amended and still only states "after a medical examination. . . ."

Likewise, Section 25-11-113(e) which states that "[t]he medical board may request additional medical evidence and/or other physicians to conduct an evaluation of the member's condition. If the medical board requests additional medical evidence and the member refuses the request, the application shall be considered void" was not amended, except to change the subsection (1)(d) to (1)(e) due to the addition of new (1)(c).

Saturday, and because her regular doctor, Dr. Louis J. Provenza, was unavailable, she saw Dr. Larry Thirstrup at the Sports Medicine Clinic, who told her she had a back strain and gave her medication to relieve the pain until she could see her neurologist, Dr. Provenza, on Monday.

¶8.     Howard did not file for disability benefits until August 26, 1997, after a visit to Dr. Provenza on August 20, 1997.   At that time he declared her to be "100% functionally disabled."   She was later informed by the Medical Board that after a careful review of her application, she would have to be evaluated by a physician chosen by PERS.   According to a memorandum for the file, dated September 25, 1997:

> Ms. Howard called to check the status of her claim.   I informed Ms. Howard that her claim was reviewed by the PERS Medical Board and a decision on her claim had been deferred pending a medical evaluation.   I told her the appt. would be here in Jackson.   She informed me that she could not travel to Jackson, she could travel only as far as Metairie, LA to see Dr. Provencia [sic]. Dr. Provencia is a very fine, competent physician and it "baffles" her that our MB could not make a decision based on the info that he submitted.   She would have to be "drugged" to even make the trip and she did not know if Dr. Provencia would give her that much medication.   "It's just not fair, I went to school and got my degree and worked hard for this money and it's mine."   She also told me that she knew of 2 teachers receiving disa bfts and they were not put through this tirade!   I explained to Ms. Howard that I did not know their particular situations but anytime the MB could not make a decision as to P/T disa. an evaluation was usually recommended.   She is going to write a statement that she can not travel to Jackson.   I told her that I would relay her msg. to the MB but I was confident that they would recommend again that she be evaluated by a physician here.

¶9.     In the summer of 1998, the Medical Board advised Howard's attorney that it was still unable to make a decision concerning disability due to insufficient medical information and requested that Howard come to Jackson for a functional capacity evaluation.   Howard's attorney informed the Medical Board that Howard was at that time living with her family in

5

Foley, Alabama, and was unable to travel to Jackson for a medical evaluation. The Medical Board then attempted to schedule an evaluation in Gulfport or Pascagoula to make it easier for her, but Howard advised PERS that she could not go to either location.[4]

¶10. According to PERS, Howard's claim for disability was reviewed by the Medical Board in September 1997, December 1997, and January 1998. In October of 1997, the Medical Board concluded that there was insufficient evidence to support the claim and requested that she be further evaluated by a physician of its choice. Howard never honored that request.

¶11. Howard did, however, on October 27, 1997, have "a routine EEG . . . for evaluation of possible seizures" performed by Dr. James M. Houser, at the request of Dr. Provenza, in Slidell, Louisiana. Dr. Houser's impression was: "[t]his is an abnormal EEG due to the electrographic seizures described above, two of which were induced by photic stimulation at 15 Hz" and are "compatible with a diagnosis of seizure disorder."

¶12. In August of 1998, the Medical Board issued its notice of claims decision informing Howard that her claim had been denied.

## STANDARD OF REVIEW

¶13. As this Court has often stated, our review of an administrative agency's findings and decisions is limited: "an agency's conclusions must remain undisturbed unless the agency's order: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) is beyond

---

[4]Howard's refusal and explanation seem odd since in order to visit Dr. Provenza in Metairie, Louisiana, and Dr. James M. Houser in Slidell, Louisiana, from Foley, Alabama, she would most likely have to first travel through Gulfport and Pascagoula.

the scope or power granted to the agency, or (4) violates one's constitutional rights." ***Pub. Employees' Ret. Sys. v. Marquez***, 774 So.2d 421, 425 (Miss. 2000).

## ANALYSIS

¶14.     Neither party suggests that PERS's order was beyond its scope or power or violated Howard's constitutional rights.     Therefore, unless PERS's order was not supported by substantial evidence, or was arbitrary or capricious, the reviewing court should not disturb its conclusions.    "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious."    ***Marquez***, 774 So.2d at 430. PERS further argues that the circuit court erred by reweighing the facts and substituting its own judgment for that of PERS.    Since PERS's first two assignments of error are so intertwined, we will discuss both issues in concert.

> **I.     DID THE CIRCUIT COURT IMPERMISSIBLY REWEIGH THE FACTS AND SUBSTITUTE ITS OWN JUDGMENT IN DETERMINING THAT HOWARD PRESENTED SUBSTANTIAL EVIDENCE OF DISABILITY,   THUS RENDERING PERS'S DECISION ARBITRARY AND CAPRICIOUS?**

¶15.     The applicant for disability "has the burden of proving to the Medical Board and to the Appeals Committee that he or she is in fact disabled." ***Pub. Employees' Ret. Sys. v. Dishmon***, 797 So.2d 888, 893 (Miss. 2001).     "This Court may neither substitute its own judgment for that of the agency which rendered the decision nor reweigh the facts of the case."  ***Marquez***, 774 So.2d at 425.    "A rebuttable presumption exists in favor of the action of an administrative agency, and the burden of proof is on the party challenging an agency's action."  ***Id.***    However,

7

"the circuit court must look at the full record before it in deciding whether the agency's findings were supported by substantial evidence." *Id.* at 427. "While the circuit court performs limited appellate review, 'it is not relegated to wearing blinders.'" *Id.* Still, this Court has said:

> Our Constitution does not permit the judiciary of this state to retry de novo matters on appeal from administrative agencies. Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law. When an administrative agency has performed its function, and has made the determination and entered the order required of it, the parties may then appeal to the judicial tribunal designated to hear the appeal. The appeal is a limited one, however, since the courts cannot enter the field of the administrative agency.

*Miss. State Tax Comm'n v. Miss.-Ala. State Fair*, 222 So.2d 664, 665 (Miss. 1969). We have further stated:

> A reviewing court cannot substitute its judgment for that of the agency or reweigh the facts of the case. Chancery and Circuit Courts are held to the same standard as this Court when reviewing agency decisions. When we find the lower court has exceeded its authority in overturning an agency decision we will reverse and reinstate the decision.

*Miss. State Bd. of Pub. Accountancy v. Gray*, 674 So.2d 1251, 1253 (Miss. 1996).

¶16. We have defined substantial evidence as "something more than a 'mere scintilla' or suspicion." *Marquez*, 774 So.2d at 425. It has also "been defined by this Court as 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion.'" *Id.* Further, substantial evidence has been described "as that which provides an adequate basis of fact from which the fact in issue can be reasonably inferred." *Dishmon*, 797 So.2d at 893.

8

This Court has similarly defined arbitrary and capricious: "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So.2d 973, 977 (Miss. 1999). "An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Id.*

¶17. Howard claims there is substantial evidence proving she is permanently disabled.[5] Dr. Larry Thirstrup, who saw Howard the day after the alleged school injury on September 26, 1996, diagnosed her with a lumbar contusion type injury. There were several medical documents presented from Dr. Provenza: (1) January 8, 1997– lumbar disc injury with radiculopathy; (2) July 31, 1997– lumbar disc injury and lumbar radiculopathy, permanent disability; August 20, 1997– totally disabled due to chronic, lumbar spine injury, lumbar pain, and leg pain. Dr. James Houser on October 27, 1997, reported an abnormal EEG which is compatible with a diagnosis of seizure disorder. Psychiatrist Dr. Terry Passman, on

---

[5] Howard states that this Court "failed to consider [her] award of Social Security Disability in reviewing if substantial evidence existed to uphold the decision of the Disability Appeals Committee." The social security disability determination was made April 24, 1998, and concluded with the notation by the administrative law judge that: "Because the claimant is a younger individual and appears capable of medical improvement, this case should be set for review in eighteen months." This Court has spoken to the issue of consideration of such benefits in *Public Employees Retirement System v. Ross*, 829 So. 2d 1238, 1242 (Miss. 2002) (citing *Marquez*, 774 So. 2d 421, 430) where we said "while it is true that PERS is not required to consider findings of the SSA, it is not required to ignore them either....They *may* be taken into account." (emphasis in original) They were taken into account in the present case.

9

February 5, 1999, diagnosed Howard with post traumatic stress disorder with somatiziation and paranoid features, and major depressive disorder.

¶18.    PERS argues there is also substantial evidence supporting its determination that Howard is not permanently disabled, as that term is defined by the statute.    The Appeals Committee expressed concern about the lack of medical records from the previous eighteen months.[6]    That notwithstanding, the Committee conducted "a careful review of all the medical records" before it, including the July 31, 1997, medical record from Dr. Provenza which indicated that Howard "is functionally disabled and unable to work @ present capacity"although Dr. Provenza noted that Howard, who was 5'31/2" and 241 pounds, was overweight and would probably benefit from a weight loss program.    Further, he answered "yes" to the question on PERS's Statement of Examining Physician, which asked if he considered that Howard's disability is "of probably long duration", and as his reason for such conclusion stated: "chronicity of complaints."

¶19.    Dr. Edward G. Lehman, in his radiology report of an MRI conducted on Howard in October 1997, noted:

---

[6] It appears that the Committee did not include in its consideration the October 1997 EEG performed by Dr. Houser to evaluate possible seizures, and February 1999 psychiatric report from Dr. Larry Passman, Fairhope, Alabama, who originally diagnosed "pseudoseizures" and subsequently diagnosed "post traumatic stress disorder which would require ongoing psychiatric therapy."

In order for Howard to receive disability retirement benefits, the disability had to be the reason she terminated her employment.  Her application mentioned only the back injury she sustained when the door was slammed on her on September 26, 1996.  She never returned to work.  Because the psychiatric problems may have been caused by the school injury, on remand, when PERS obtains a medical examination of Howard by a physician or physicians of its choice, the connection, if any, between the back injury and the psychiatric problems should be considered.

The thoracic vertebrae show normal signal intensity without demonstration of any metastatic disease or compression fracture. The thoracic spinal cord appears to be of normal signal intensity without evidence of any mass or syrinx. I see no central canal stenosis. I fail to see any definite disk protrusion or extrusion throughout the thoracic spine.
Impression: Normal MRI of the thoracic spine study.

¶20. In May 1997, Dr. Gustavo A. Gutnisky conducted a physical examination on Howard and reported:

[Howard has] no acute distress with a normal gait.. . . doesn't have evidence of muscle spasm . . .no weakness of the lower extremities . . . no evidence of a recurrent herniated disc. . . . has lower pain with some degree of radicular pain . . . has no objective findings; all the findings are subjective. Some of the symptoms do fit the radicular distribution of pain; however, on the other hand, she has persistent pain on the straight leg raising after I bent the knee, which should have relieved the pain, so some of the physical findings are contradictory. . . . I think the patient ought to have a lumbar myelogram and a CAT scan . . . and she should need a Functional Capacity Evaluation to see what kind of activities she can do.

The recommended lumbar myelogram and CT scan was done on June 2, 1997, by radiologist Dr. James J. Silvestri, with Dr. Provenza performing the contrast injection and lumbar puncture. Dr. Silvestri reported "mild lumbar stenosis at L3-4...and probably a mild bulge. No root compression is evident." Further, he said that L4-5 had a "mild central disk bulge-protrusion without significant central stenosis. Suggestion of some mild root compression." The post myelogram CT scan followed, with Dr. Silvestri's determining that L1-2 and 2-3 "had no significant disk protrusion or extrusion, and no lumbar stenosis"; that "L3-4 had mild lumbar stenosis produced by mild bulge"; that "L4-5 had post surgical changes . . .[and] no significant disk protrusion is evident. There is no significant lumbar stenosis evident. The L5-S1 level appears unremarkable."

¶21.    In ***Byrd v. Public Employees' Ret. Sys.***, 774 So.2d 434 (Miss. 2000), we affirmed the circuit court's finding that PERS properly denied Byrd's claim for permanent disability.[7]    ***Id.*** at 436.  We held:

> Although the assessments of the medical personnel who treated Byrd are in stark contrast from one another, it was the job of PERS to determine which of these assessments to rely on in making its decision.  The opinions of Dr. Vohra and Charlene Toney, standing alone, are sufficient to support a finding that Byrd is not permanently disabled.  To the contrary, had PERS found Byrd to be permanently disabled, Dr. Pearson's opinion, standing alone, would appear to support such a finding.  In rendering its decision to deny Byrd's application for permanent disability benefits, PERS obviously gave more weight to the findings of Dr. Vohra and Charlene Toney than was given to the findings of Dr. Pearson.  Such an act was within PERS' discretion.  Therefore, we hold that there is sufficient evidence in the record supporting PERS' decision in this case.

***Id***. at 438.    Clearly PERS was presented with contradictory evidence in assessing Howard's disability status.    However, it is for PERS, as the fact finder, to determine which evidence is more believable or carries the most weight. There is sufficient evidence to support PERS's decision.

¶22.    The Uniform Rules of Circuit and County Court Practice discuss the scope of review for the circuit court:

> **Rule 5.03.  Scope of appeals from administrative agencies.**
>     On appeals from administrative agencies the court will only entertain an appeal to determine if the order or judgment of the lower authority:
> 1.      Was supported by substantial evidence; or
> 2.      Was arbitrary or capricious, or
> 3.      Was beyond the power of the lower authority to make; or
> 4.      Violated some statutory or constitutional right of the complaining party.

---

[7] We reversed and remanded, however, on other grounds (a physician who was on the Medical Board participated in the appeals process reviewing the Medical Board's decision).

URCCC 5.03. As this Court has said, "[t]he question here is not whether there was evidence in support of [Howard's] disability, but whether there was substantial evidence to support the finding of the administrative agency." *Dishmon*, 797 So.2d at 892.

¶23. The Medical Board which denied Howard's claim was made up of three physicians. The Appeals Committee which agreed with that determination included two physicians. Sorting through voluminous and contradictory medical records, then determinating whether an individual is permanently disabled is better left to physicians, not judges. This is the idea behind the creation and expansion of administrative agencies. "The existence within government of discrete areas of quasi-legislative, quasi- executive, quasi-judicial regulatory activity in need of expertise is the *raison d'etre* of the administrative agency." *McGowan v. Miss. State Oil & Gas Bd.*, 604 So.2d 312, 323 (Miss. 1992). "Because of their expertise and the faith we vest in it, we limit our scope of judicial review." *Id. See also Grant Ctr. Hosp. of Miss., Inc. v. Health Group of Jackson, Miss., Inc.*, 528 So.2d 804, 810 (Miss. 1988) ("The agency that works with a statute frequently, if not daily, that sees it in relation to other law in the field, necessarily develops a level of insight and expertise likely beyond our ken. When such agencies speak, courts listen."); *Colonial Savs. & Loan v. Sec. Savs. & Loan Ass'n*, 288 So.2d 857, 859 (Miss. 1974) ("We also recognize that the board has a certain amount of experties [sic] in its field and has a reasonable latitude in the exercise of sound judgment in its performance of its specialized function.").

13

¶24.  However, "[i]f an agency does not disclose the reason upon which its decision is based, the courts will be usurped of their power of review over questions of law." *McGowan,* 604 So.2d at 324. "It is a logical and legal prerequisite to intelligent judicial review in these cases that the Board favor us with more than mere conclusory findings." *Id.* "The Board may, if it deems it appropriate, stand by its prior orders, provided only that it make more that conclusory 'written findings of fact and conclusions of law setting forth the reasons for the Board's decision.'" *Id.*

¶25.  In the case sub judice, the Appeals Committee stated:

> The patient again had surgery at the end of May, 1997[8], on her lower back and was released to light activity on the 3rd of June, 1997. A post-operative EMG with needle examination and nerve conductions was performed on June 3rd, which showed that everything was normal in the right lower leg. She was recommended for physical therapy. In August of 1997 her physical therapist reported that Ms. Howard exhibited inconsistent pain behavior and that there was no significant objective findings to support her subjective complaints. This comports with Dr. Silvestri's radiology report showing only mild lumbar stenosis and disk bulge and no evidence of recurrent disk extrusion or lumbar stenosis.
>
> In addition Dr. Gutnisky examined Ms. Howard on May 14, 1997. In this exam, Dr. Gutnisky[9] reviewed her myelograms, which were negative for a recurrent herniated disk. His exam also revealed contradictory physical

---

[8]Howard correctly points out that this is an incorrect date. Her only surgery relevent to this case, a lumbar laminectomy (also referred to in the record as a diskectomy) and nerve root decompression, was performed by Dr. Provenza on December 14, 1995.

[9]Howard correctly points out that Dr. Gutnisky did not review her myleogram. He was consulted for an examination only, when Dr. Provenza recommended that a myelogram should be done. Dr. Gutnisky provided a detailed two-page explanation of his examination and impressions, and concluded that Howard "ought to have a lumbar myelogram and a CAT scan, to determine whether there was a surgical lesion or not. He also concluded that if there was no surgical lesion, she would have reached MMI, and would "need a Functional Capacity Evaluation to see what kinds of activities she can do."

findings. For example, Ms. Howard complained of radiating pain in her leg on a straight leg raising test, however, after the knee was bent she continued to complain of pain; this would have relieved the pain had she had true radiculopathy. Dr. Gutnisky found no subjective grounds for her complaints of pain. All his findings were subjective, i.e., the patient's subjective complaints of pain.

A careful review of all of the medical records in this case show no present evidence of physical disability. The only evidence of disability is of Ms. Howard's subjective complaints made to her physicians, and there is evidence of exaggeration of symptoms and complaints. The Disability Appeals Committee finds Ms. Howard's testimony not to be credible.

¶26. In sum, Howard failed in her burden to prove permanent disability as a result of the September 26, 1996 injury. PERS's decision was supported by such relevant evidence as reasonable minds might accept as adequate to support the conclusion that Howard was not permanently disabled from performing her job as teacher. PERS's decision was reached according to reason and judgment, not depending on the will alone, nor in a whimsical manner. PERS has disclosed the reasons upon which its decision is based, not mere conclusory findings. Thus, PERS's decision was supported by substantial evidence and was not arbitrary and capricious.

¶27. Finally, we suggest to PERS that adherence to the statutory procedures for determination of disability should decrease the growing number of claims coming to the courts, and we note the following language of the statute:

The medical board may request additional medical evidence and/or other physicians to conduct an evaluation of the member's condition. If the medical board requests additional evidence and the member refuses the request, the application shall be considered void.

15

Miss. Code Ann. § 25-11-113(1)(e) (1999).[10] The record indicates that the Medical Board repeatedly requested that Howard submit to an additional evaluation to be performed by a physician of its choice. Howard never honored that request. Thus, it was not necessary for the Medical Board to rule on her disability status, because her refusal to provide the requested evaluation mandates that her application "shall be considered void." However, PERS chose not to apply this provision and proceeded to make its decision on the merits of the records before it.

## II. DID THE CIRCUIT COURT ERR IN AWARDING HOWARD DISABILITY BENEFITS RETROACTIVELY?

¶28. The circuit court awarded disability status to Howard retroactively to January of 1997. However, the statute reads in pertinent part:

> Any retirement allowance or other annuity or benefit provided by Articles 1 and 3 shall be paid in equal monthly installments . . . and no benefits shall be paid for any period prior to the first of the month following receipt of such application for such benefits, but in no event prior to termination of employment . . ..

Miss. Code Ann. § 25-11-139 (1999). According to the index, Article 3 includes Sections 25-11-101 through 25-11-141. Section 25-11-113(1)(a) reads, "may be retired . . . on the first of the month following the date of filing such application on a disability retirement allowance, but in no event shall the disability retirement allowance commence before termination of state service . . . ." Section 25-11-114(6) reads similarly.

---

[10]Prior to the amendment referenced in footnote 2, supra, this was subsection (d), the content of which was unchanged by the amendment.

16

¶29. The statute also clearly says, "no benefits shall be paid for any period prior to the first of the month following receipt of such application . . . ." "Shall" is mandatory and places no discretion in PERS or the circuit court to circumvent the clear mandate of the statute. If, on remand, Howard is found eligible for disability benefits, those benefits cannot be paid retroactively beyond September 1, 1997.

## CONCLUSION

¶30. In reversing PERS's denial of disability benefits to Marcia Howard, the circuit court impermissibly reweighed the facts and substituted its judgment for that of the administrative agency. Although contradictory evidence was presented, it was the sole province of PERS, not the circuit court, to determine which evidence to believe and which evidence should be given greater weight. PERS disclosed the reasons upon which its decision is based, thus allowing this Court to conduct informed judicial review. PERS's decision to deny benefits was supported by substantial evidence and, thus, was not arbitrary or capricious.

¶31. Due to the unduly long passage of time since this case was begun, Howard should not only submit to an evaluation by a physician or physicians of PERS's choice but also she has the right, if she chooses, to have an updated evaluation made by physicians of her choice.[11] In this medical evaluation process both parties should address, inter alia, Howard's cervical

---

[11]Howard emphatically points out that Dr. Passman has already made the connection between the diagnoses of post traumatic stress disorder and depression caused by Howard's September 26 injury, and there is no need for him to make that connection again. She misses the point here. We have clearly given her the option of standing on Dr. Passman's February 5, 1999, report or getting an updated report from him or another physician of her choice. We also have given PERS the opportunity to have an updated evaluation of Howard performed by a physican of its choice.

17

spine impairment; the diagnoses of post traumatic stress disorder and depression; and the connection, if any, between them and her condition, as of July 28, 1997, which "compelled her to stop work."

¶32.    For these reasons, we reverse the judgment of the circuit court, and we remand this case to PERS for further proceedings consistent with this opinion.

¶33.    **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER, P.J.,  CARLSON, DICKINSON, AND RANDOLPH,  JJ., CONCUR.  EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.   DIAZ, J., NOT PARTICIPATING.**